UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| VALARIE MOORE | § | |
| | § | |
| *Plaintiff,* | § | |
| VS. | § | CIVIL ACTION NO. 3:16-CV-035 |
| | § | |
| NANCY A. BERRYHILL,[1] ACTING | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION | § | |
| | § | |
| *Defendant.* | | |

## MEMORANDUM OPINION AND ORDER

Valarie Moore has filed this lawsuit to appeal a decision denying her applications for social security disability benefits and supplemental security income under Title II and Title XVI of the Social Security Act.

### FACTUAL AND PROCEDURAL BACKGROUND

Moore was born on April 2, 1970, and she completed high school. On April 30, 2014, she applied for social security disability benefits, alleging that she became disabled on July 1, 2013. She also applied for supplemental security income. At the time she applied, Moore alleged that she was disabled because of a history of stroke, problems with balance and coordination, heart problems, blood pressure problems, depression, and chronic pain. She later reported that her disabilities had worsened, specifically her heart problems and problems with balance. Moore reported she has weakness in her right arm

---

[1] Carolyn W. Colvin was the Commissioner of the Social Security Administration ("SSA") at the time that Plaintiff filed this case but no longer holds that position. Nancy A. Berryhill is Acting Commissioner of the SSA and, as such, is automatically substituted as Defendant. *See* FED. R. CIV. P. 25(d).

and leg, short term memory loss, difficulties processing information, and difficulty explaining things.

Her claims were denied initially, and again on reconsideration. Moore sought a hearing before an administrative law judge ("ALJ"). On July 16, 2015, ALJ Thomas G. Norman held a hearing at which Moore and her counsel appeared. An impartial vocational expert ("VE") also testified before the ALJ. At the hearing, the ALJ admitted exhibits into the record without objection The ALJ also admitted evidence after the hearing, which he considered when making his decision.

On September 2, 2015, ALJ Norman issued a decision denying Moore's application. The Appeals Council confirmed the denial, and this action followed.

## Summary of the ALJ's Decision

The ALJ's decision followed the usual five-step process. First, the ALJ found that Moore had not engaged in substantial gainful activity since July 1, 2013, her alleged date of disability. Second, ALJ Norman found that Moore suffered from the following severe impairments: "post cerebral vascular accident, history of congestive heart failure, atrial fibrillation, obesity and depression." He found that Moore's impairments of hypertension and hypothyroidism were not "severe."

Third, ALJ Norman evaluated all of Moore's impairments, and found that Moore's impairments, alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In this section of his decision, ALJ Norman discussed the severity of Moore's mental impairments, finding that the severity of her mental impairments did not meet or medically equal the severity

of the criteria in section 12.04. The ALJ noted that he had considered the "paragraph B" criteria, and made several findings regarding the severity of her mental impairments with respect to these criteria. He found that Moore had only mild restrictions in activities of daily living, particularly relying upon Moore's statements that she is able to take care of her personal needs with some difficulty, prepares her meals, performs household chores, and shops. Similarly, he found that Moore's statements also supported a finding that she had only mild difficulties in social functioning. With regard to concentration, persistence or pace, ALJ Norman found that Moore had moderate difficulties. He noted that Moore reported difficulties in sustaining attention, but that she also reported shopping, performing household chores, engaging in hobbies and interests, and watching television. He also noted that Moore was able to count change, pay bills, use a checkbook and handle a savings account.

At this point, ALJ Norman assessed Moore's residual functional capacity "RFC" and found that she had the RFC to perform sedentary work, except that she can stand and walk for 4 hours, and sit for approximately 6 hours out of an 8-hour day. He found that Moore was not able to climb ladders, but that she could occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs. He also found that she could occasionally reach, handle and finger with her right arm. As to her mental RFC, some of ALJ Norman's findings were that Moore could understand, remember and carry out only simple instructions, make simple work-related decisions; and attend and concentrate for extended periods on simple tasks. ALJ Norman reviewed Moore's reported symptoms, but he found that the objective medical evidence did not support the full spectrum of

Moore's allegations regarding their effect upon her ability to perform work. He particularly found that the medical records "failed to document any objective clinical or diagnostic findings that would preclude the performance of sedentary work as set forth in this decision."

ALJ Norman then reviewed the medical evidence regarding Moore's physical symptoms, beginning with Moore's "cerebral vascular accident" and implantation of a cardio-defibrillator in 2005. He also reviewed treatment records and objective tests from July 2012, September 2012, October 2012, September 2013, October 2013, December 2013, January 2014, April 2014, June 2014, July 2014, June 2015, and July 2015. ALJ Norman noted Moore's visits with her treating physician, Dr. George Kevorkian, in December 2013 and June 2014, and her visit with consultative examiner Raymond Alexander in July 2014.

He next reviewed the treatment and records regarding Moore's mental status. He noted that, although Moore had been prescribed Lexapro, there was no medical evidence from that prescriber and no statements "from treating sources regarding what symptoms, if any, that the claimant has actually displayed." ALJ Norman reviewed the records regarding the consultative medical examination by Dr. Julie Swanson in July 2014.

As to medical opinions in the record, ALJ Norman reviewed Dr. Kevorkian's opinion from November 2014, in which Dr. Kevorkian opined that Moore was able to work no more than 20 hours per week. ALJ Norman gave this opinion "little weight" however, because Dr. Kevorkian "failed to provide a function-by-function assessment of the claimant's work-related limitations. Moreover, the doctor failed to provide any basis

or reasoning as to why he was limiting the claimant to working only 20 hours per week." Further, ALJ Norman noted that Dr. Kevorkian's treatment relationship with Moore was "extremely limited." ALJ Norman also accorded "little weight" to the opinions of Dr. Julie Swanson, explaining that she had "simply noted that [Moore] had a 'moderate' ability to make occupational and personal decisions . . . and failed to provide a definitive assessment of [Moore's] work-related limitations." Finally, with respect to Dr. Alexander, although ALJ Norman gave "great weight" to most of Dr. Alexander's opinions, he gave "little weight" to Dr. Alexander's opinion that Moore was unable to lift or carry objects, finding that this opinion was inconsistent with his examination that had revealed only "mild" weakness of Moore's right upper arm and extremities. ALJ Norman gave "great weight" to two State Agency psychiatrists, and to two state agency reviewing physicians.

After assessing Moore's RFC, ALJ Norman found that she was unable to perform her past relevant work as a special education teacher. However, in light of her age (43 years old at the time of the alleged disability onset), education, work experience, and RFC, ALJ Norman found that jobs existed in significant numbers in the national economy that Moore could perform. He relied upon the VE's testimony that a hypothetical person of Moore's background and RFC could work as call out operator, escort vehicle driver, and surveillance system monitor, and that these jobs existed in significant numbers in Texas and in the national economy.

Moore now contends that the ALJ's decision contains several errors and should be reversed.[2] First, Moore contends that Dr. Alexander performed his consultative exam and issued his opinions in 2014, but he did not have the opportunity to review what she contends is important medical evidence from her treatment that was submitted in June and July 2015. Pointing to SSR 96-5P, Moore contends that the ALJ erred in relying on Dr. Alexander's opinions because they were formed without the full spectrum of medical evidence that was before the ALJ. Second, Moore contends that ALJ Norman's physical and mental RFC assessment conflicts the medical evidence in several places, and that ALJ Norman improperly discounted opinions from Dr. Swanson as well as Moore's treating physician, Dr. Kevorkian. Moore contends these errors led to an erroneous RFC, which in turn caused ALJ Norman to further err when he found that Moore could perform jobs listed by the VE. Moore argues that, if the RFC assessment had been properly formulated to include her true level of restrictions, ALJ Norman would have been obligated to find that she was disabled.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069,

---

[2] Moore's briefing is sometimes very difficult to follow. The Court has responded to her arguments, but has renumbered or reorganized them to proceed in a more logical fashion.

1075 (5th Cir. 1994). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc*. 529 F.3d 335, 339 (5th Cir. 2008). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV Inc. v. Robson,* 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

## STANDARD OF REVIEW

Judicial review of the ALJ's final decision under 42 U.S.C. § 405(g) is limited to determining whether the ALJ's decision is supported by substantial evidence in the record and whether the proper legal standard was used in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir.1994), cert. denied, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). The Court must affirm the ALJ's final decision where substantial evidence supports the ALJ's decision and the Commissioner followed the relevant legal standards. *See Higginbotham v. Barnhart*, 405 F.3d 332, 335 (5th Cir.2005). Reversal is appropriate only where no credible evidentiary choices support the Commissioner's decision. *See Johnson v. Bowen*, 864 F.2d 340, 343–14 (5th Cir. 1988).

This Court may not reweigh the evidence, try the issues *de novo*, or substitute judgment for the Commissioner's finding. *Audler v. Astrue,* 501 F.3d 446, 447 (5th Cir. 2007).

## APPLICABLE LAW

### A. Statutory Basis for Benefits

Social Security disability insurance benefits are authorized by Title II of the Social Security Act. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *See* 42 U.S.C. § 423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability).

SSI benefits are authorized by Title XVI of the Social Security Act and provide an additional resource to the aged, blind, and disabled to assure that their income does not fall below the poverty line. 20 C.F.R. § 416.110. Eligibility for SSI is based on proof of disability and indigence. *See* 42 U.S.C. § 1382(c)(a)(3) (definition of disability); 42 U.S.C. § 1382(a) (financial requirements). Although these are separate and distinct programs, applicants to either program must prove "disability" under the Act. *See* 42 U.S.C. § 423(d)(1)(A) (disability insurance); 42 U.S.C. § 1382(c)(3)(A)(SSI). The law and regulations governing the determination of disability are the same for both programs. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

### B. Determination of Disability

Under the Social Security Act, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." *Id*. § 423(d)(2)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality demonstrable by acceptable clinical and laboratory diagnostic techniques. *Id*.; 42 U.S.C. § 1382c(a)(3) (B).

The five-step "sequential evaluation" process for determining disability is set out in the Commissioner's regulations. The steps are: (1) Is the claimant currently performing substantial gainful activity? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent the claimant from doing past relevant work? (5) Does the impairment prevent the claimant from doing any other work? *Audler v. Astrue*, 501 F.3d 446, 447–48 (5th Cir. 2007) (summarizing C.F.R § 404.1520(a)(4)(i)-(v)). If, at any step, the ALJ determines the claimant to be disabled, the determination is conclusive and the inquiry ends. *Id*.

The burden of establishing disability rests with the claimant for the first four steps, and then shifts to the Commissioner to show that there is other substantial work in the national economy that the claimant is able to perform. *Id*. The Commissioner's analysis at steps four and five is based on the assessment of the claimant's RFC, or the work a claimant still can do despite his or her physical and mental limitations. *Perez v. Barnhart*,

415 F.3d 457, 461–62 (5th Cir. 2005); 20 C.F.R. §§ 404.1545 and 416.945. The Commissioner assesses the RFC before proceeding from step three to step four. *Id*. Once the Commissioner shows that a claimant is able to perform a significant number of jobs in the national economy, the burden shifts back to the plaintiff to rebut the finding. *Id*.

## ANALYSIS

### A. Did the ALJ err by relying on medical opinions from physicians who did not have an opportunity to review all of the medical evidence in the record that the ALJ considered?

On July 29, 2014, Dr. Raymond Alexander conducted a consultative medical exam. He interviewed Moore and took her medical history, noting complaints of "stroke, high blood pressure and heart problems and balance/coordination issues." Moore reported that she had right facial weakness and difficulty standing and difficulty with gait, as well as "frequent falls" since having a reaction to Warfarin after 2005. Dr. Alexander performed a physical exam and noted his findings. He noted "some mild right-sided weakness in the upper and lower extremities" and that Moore's "[g]ait is slow" and she "uses a cane all the time." He also reported that Moore was unable to "walk on her heels or toes or do tandem walking." Based on these notes and his exam, Dr. Alexander gave a detailed opinion as to Moore's functional capacity.

As noted above, the hearing before the ALJ took place on July 16, 2015—almost one year after Dr. Alexander's consultative exam. However, just one month before the hearing, Moore's counsel mailed a letter to Leachman Cardiology, requesting Moore's entire medical chart from December 2014 through June 2015. That letter, along with 111 pages of records from Leachman Cardiology, was submitted to the ALJ before the

hearing and the medical records were admitted before the hearing began. The Court has reviewed these records. Some are hand-written notes recording individual office visits to Leachman Cardiology, others are lab and diagnostic reports, and others are duplicate records from other health care providers. Moore's argument appears to be that, because the state agency physicians such as Dr. Alexander did not have the benefit of these records, their opinions should be disregarded under SSR 96-5P.

The Court notes that, out of 111 pages provided by Leachman Cardiology, Moore's motion for summary judgment points to just one page containing hand-written notices from an office visit to Leachman Cardiology on July 2, 2015, which states that Moore reported "doing poorly – issues with multiple falls at home over the past year. Unnoticed by family, etiology unclear. Slow, shuffling gait." Tr. 387. These notes do not contain limitations or concerns that differ significantly different from those noted by Dr. Alexander.

Moore also points to records regarding her hospitalization in June 2015—one month before the ALJ hearing—contending that they show a long list of serious conditions that should have been evaluated by state agency physicians. She contends that the ALJ erred by considering the opinions of state agency physicians who did not have the opportunity to review these medical records, and by failing to obtain an updated medical opinion.

The Court begins with the principle that, while an ALJ "may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of [a listing]," an ALJ "[is]

not bound by any findings made by State agency medical or psychological consultants." 20 C.F.R. §§ 404.1527(e)(2)(i), (iii) (emphasis added); *see also Dominguez v. Astrue*, 286 Fed. App'x 182, 186 (5th Cir. 2008) ("the use and consideration of medical expert testimony is solely within the discretion of the ALJ."). The determination of whether or not a claimant satisfies the conditions of a listing is "one reserved to the Commissioner." *See* 20 C.F.R. § 404.1527(d)(2); *see also Cain v. Barnhart*, 193 Fed. App'x 357, 361 (5th Cir. 2006); and SSR 96–6p at *3.

There is no doubt that an ALJ does have "a duty to fully and fairly develop the facts relative to a claim for disability benefits." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir.2000). However, reversible error for an ALJ's failure to develop the record requires a showing of prejudice. *Id*. Therefore, Moore must "adduce [ ] evidence that might have altered the result." *Id*. She has produced no such evidence. *See Jones v. Astrue*, 691 F.3d 730, 735 (5th Cir.2012) cert. denied, —— U.S. ——, 133 S.Ct. 953, 184 L.Ed.2d 728 (U.S.2013) ("A mere allegation that additional beneficial evidence might have been gathered had the error not occurred is insufficient to meet this burden."). Instead, the "new medical evidence" she points to shows the same or similar conditions and symptoms listed by Dr. Alexander, and which were considered by state agency physicians and then by the ALJ. Moore does not explain how the "new" evidence she points to, which was actually considered by the ALJ, would have changed the result if it had also been considered by state agency examiners.

**B. Does the RFC assessment conflict with the medical evidence in the record?**

Next, Moore complains that the ALJ's RFC conflicts with the medical evidence. She complains that the ALJ did not properly consider her need to use a cane, nor did he agree with the state agency physician's findings as to her mental and physical limitations, instead improperly discounting opinions from Dr. Alexander and Dr. Swanson as well as Moore's treating physician, Dr. Kevorkian.

**1. Physical RFC: Limited to 20 Hours? Use of Cane?**

ALJ Norman found that Moore had the RFC to perform sedentary work,[3] except that she can stand and walk for 4 hours, and sit for approximately 6 hours out of an 8-hour day. He found that Moore was not able to climb ladders, but that she could occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs. He also found that she could occasionally reach, handle and finger with her right arm.

Moore is correct that the ALJ did not limit her to only 20 hours of work per week, and that his RFC formulation did not specifically include her use of a cane.

In addition to his review of the medical evidence, the ALJ made two important findings that are germane here. The ALJ found that Moore's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible . . ." He made this finding, in part, because he also found that "[t]he record does not support the claimant's allegations of ongoing and disabling symptoms. Specifically, records

---

[3] Under the applicable regulations, sedentary work is defined as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a), 416.967(a). Social Security Ruling ("SSR") 96-9p emphasizes that the ability to lift and carry ten pounds is necessary for the unskilled sedentary occupational base. SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996).

submitted by treating and examining sources fail to document any objective clinical or diagnostic findings that would preclude the performance of sedentary work as set forth in this decision." Second, the ALJ noted that Moore "has also acknowledged activities of daily living that are inconsistent with her allegations of ongoing and disabling symptoms. Specifically, the claimant acknowledged in written statements that she takes care of her personal needs, prepares meals, shops, performs various household chores including cleaning, laundry and vacuuming, and socializes with others on a regular basis."

Moore complains that the ALJ failed to include the 20-hour per week limitation set forth by her treating physician, Dr. C. George Kevorkian, and the ALJ instead stated that he gave "little" weight to the opinion. The "opinion" from Dr. Kevorkian that Moore points to is a three-sentence letter written by Dr. Kevorkian on his letterhead on November 10, 2014. Tr. 556. In its entirety, it states "To Whom It May Concern: Ms. Valarie Moore/ 04-02-1970, is a patient under my care in the Physical Medicine and Rehabilitation Clinic through Baylor College of Medicine. Ms. Moore is able to work with a limitation of no more than 20 hours per week. Please do not hesitate to call with questions, comments or concerns." The ALJ states that he gave this opinion little weight because Dr. Kevorkian did not provide a function-by-function assessment of claimant's work-related limitations, failed to provide a basis for his opinion that Plaintiff can only work 20 hours per week, and had an "extremely limited" treatment relationship with Moore.

Moore argues that the ALJ failed to comply with the requirement that an ALJ may reject the opinion of a treating physician only after performing a detailed analysis of the

treating physician's views and discussing factors such as: 1) examining relationship; 2) treatment relationship; 3) length of treatment relationship and frequency of examination; 4) nature and extent of the treatment relationship; 5) supportability; 6) consistency; and 7) specialization. 20 C.F.R. §§ 404.1527(d) and 416.927(d). Although Moore is technically correct that the ALJ did not devote a great deal discussion of these factors in his decision to give Dr. Kevorkian's opinion "little weight," the Court notes the ALJ's analysis on this point was longer and more detailed than Dr. Kevorkian's actual "opinion." *See, e.g., Foster v. Astrue*, 410 Fed. App'x. 831, 833 (5th Cir. 2011) (finding good cause to assign little weight to a treating physician's questionnaire opinion "due to its brevity and conclusory nature, lack of explanatory notes, or supporting objective tests and examination . . ."). The ALJ did address the actual medical records from Dr. Kevorkian in greater detail, and had noted a gap in treatment. Accordingly, ALJ did not err by assigning Dr. Kevorkian's "opinion" little weight.

Moore also contends that the ALJ failed to consider her need to use a cane, and failed to include that need for a cane in her RFC. Moore claims that her need for a cane was supported by physician reports at the initial and reconsideration levels of her disability application, and by the opinion of Dr. Alexander, the state agency examining physician, who stated that Moore "did not appear to be able to ambulate safely without the cane." The first of these statements about her need for a cane, however, are based upon Moore's self-report that she was prescribed a cane and that she needed a cane to walk. Further, although Dr. Alexander opined that Moore's physical abilities were limited by her "weakness and risk of fall," his actual exam findings showed that Moore's

musculoskeletal exam was "within normal limits" and that she had only "mild right-sided weakness in the upper and lower extremities," and although her gait was "slow," she did not have a tremor and instead had "adequate grip strength and ability to reach, handle, finger and feel." In fact, evidence in the record showed that Moore walked "with no difficulties" after physical therapy in 2014. Moore's self-reported activities included household chores such as cleaning, laundry, and vacuuming. And Moore herself testified that she was able to walk without her cane or walker for a distance of "a couple of feet. Maybe about five, ten feet."

In light of all the evidence in the record, the ALJ did not err by failing to account for Moore's use of a cane when formulating her RFC. *See, e.g., Thomas v. Astrue*, 277 Fed. App'x. 350, 353 (5th Cir. 2008) (citing *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001)) ("As a result of these inconsistencies, the ALJ was within his discretion to discount Dr. Riley's records as being internally inconsistent and inconsistent with the overall record."); *Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991) (ALJ may disregard claimant's subjective symptomology to the extent it is inconsistent with the record evidence under a proper exercise of the discretion as the finder of fact); *Wilson v. Colvin*, 2014 WL 4230003, at *4 (N.D. Tex. Aug. 25, 2014) ("To the extent Dr. Shamsnia's treatment notes contained medical opinions that were inconsistent with the rest of the medical opinions on the record, the ALJ had discretion to choose among the conclusions of different examining physicians.")

## 2. Mental RFC: Moderate or Mild Limitations in Activities of Daily Living? Ability to Make Decisions?

In arguing that the mental RFC is incorrect, Moore contends that the state agency examining psychiatrists opined that she had "moderate" limitations in concentration, persistence and pace, as well as "moderate" restrictions in activities of daily living, but the ALJ found that her restrictions in activities of daily living were only "mild." These arguments somewhat conflate mental RFC with the ALJ's assessment of the "severity" of Moore's mental impairments,[4] "although the RFC assessment 'reflects' the severity analysis, and so must be consistent with it." *Cruz v. Colvin*, CV H-15-3389, 2016 WL 8672925, at *3 (S.D. Tex. Dec. 28, 2016), report and recommendation adopted sub nom. *Cruz v. Colvin*, CV H-15-3389, 2017 WL 1274296 (S.D. Tex. Jan. 27, 2017).

In evaluating the severity of Moore's mental impairments, *i.e.*, depression, the ALJ found that Moore had mild restrictions in activities of daily living, noting that Moore herself reported that "she takes care of her personal needs with some difficulty, prepares meals, performs household chores, and shops." The ALJ found that Moore had mild difficulties in social functioning, again noting that Moore herself "denied having any difficulties getting along with others, and has never been fired or laid off from a job due to difficulties with others." The ALJ again noted Moore's own statements that she

---

[4] "Under agency regulations then in place, mental impairments were evaluated under four broad functional areas known as the 'paragraph B' criteria: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. The degree of limitation in each category is based on a five point scale: None, mild, moderate, marked, or extreme. A rating of 'none' or 'mild' in all four areas will generally result in a conclusion that the impairment is not severe." *Patel v. Berryhill*, 4:16-CV-02066, 2017 WL 4155463, at *2 (S.D. Tex. Sept. 19, 2017), citing 20 C.F.R. § 404.1520a(d)(1) (also noting, "The SSA updated its mental disability listings in 2017, and replaced the term "episodes of decompensation" with the term "adapt or manage oneself.").

"shops, and spends time with others." With regard to concentration, persistence or pace, the ALJ found that Moore had "moderate" difficulties. He noted that she reported difficulties sustaining attention in spite of her self-reported activities and hobbies, but that she was able to "count change, pay bills, use a checkbook/money order, and handle a savings account," all of which the ALJ found were "activities requir[ing] the ability to maintain concentration, persistence or pace for extended periods." He also found that Moore's activities of daily living were evidence that she could "follow instructions and complete tasks once begun."

For Moore's mental RFC, the ALJ found that Moore could understand, remember and carry out only simple instructions, make simple work-related decisions; respond appropriately to supervisors, co-workers and the public; respond appropriately to changes in unusual work situations; handle changes in routine work setting appropriately; and attend and concentrate for extended periods on simple tasks. In addressing her mental RFC, the ALJ noted that Moore had been prescribed Lexapro, but that the medical records also showed "little evidence" of actual treatment for mental issues, and "no statements from treating sources regarding what symptoms, if any, [Moore] has actually displayed. The ALJ also addressed the findings and opinion of consultative examiner Dr. Julie Swanson, discussing those findings in some detail.

Still, Moore complains that the ALJ improperly gave "little weight" to one part of Dr. Swanson's opinion, which was that Moore had a "moderate" ability to make occupational and personal decisions. The ALJ found that Dr. Swanson's opinion did not include a "definitive assessment of the claimant's work-related limitations." The ALJ

instead assessed a more limited RFC for Moore, finding that Moore could make only "simple work-related decisions." The ALJ based this assessment, in part, on his decision to give "great weight to [the] assessments completed by State Agency psychiatrists, Leela Reddy, M.D., and Susan Thompson, M.D., which reflect that the claimant is able to understand, remember and carryout simple instructions, make simple decisions, attend and concentrate for extended periods and interact adequately with coworkers and supervisors." The ALJ further noted that "[t]hese opinions are consistent with the longitudinal record as well as the claimant's statements regarding daily activities."

In light of the evidence in the record, and in light of the findings in Dr. Swanson's report, the ALJ did not err in assigning the "little weight" to Dr. Swanson's opinion on this point.

### C. Did the ALJ pose a flawed hypothetical question to the VE?

ALJ Norman found that there are jobs that Moore can perform, and that these jobs exist in significant numbers in the national economy. In making this finding, he relied upon the VE's testimony that a hypothetical person of Moore's background and RFC could work as a call out operator, escort vehicle driver, and surveillance system monitor, and that these jobs existed in significant numbers in Texas and in the national economy. Moore argues that the ALJ's hypothetical question to the VE was fatally flawed because it did not include Moore's use of a cane while walking or standing, her limitation to 20 hours per week, her moderate limitations in the activities of daily living, and her limitations with respect to lifting and carrying objects due to her use of a cane. The Court has already addressed these issues above with respect to the RFC assessment. Because

these limitations are not supported by the record, the ALJ did not err by not including these limitations in the hypothetical question to the VE.

Next, Moore argues that the ALJ's finding that she could perform the jobs of call out operator and surveillance monitor are in conflict with his RFC assessment that Moore could understand, remember and carry out only simple instructions; make simple work-related decisions, and attend and concentrate for extended periods on only simple tasks. Moore also argues she cannot perform the job of escort vehicle driver because she has been instructed not to drive.

For the jobs of call out operator and surveillance monitor, Moore contends that the ALJ's RFC formulation means that she cannot perform the jobs listed by the VE and the ALJ. She contends that these jobs have a "Reasoning Level" of 3 listed in the Dictionary of Occupational Titles, and the ALJ limited her to "simple" work. However, Moore's contention that she is absolutely precluded from any job with a Reasoning Level 3 is not supported by the language of the regulations at issue. *See, e.g., Ruffin v. Colvin*, 3:16CV18-DPJ-FKB, 2017 WL 536549, at *5 (S.D. Miss. Feb. 8, 2017) ("The problem is that the Reasoning Levels and the RFC are not neatly aligned. . . . So while the top of DOL Reasoning Level three might arguably surpass an RFC that limits work to tasks involving one-to two-step instructions, it is not apparent that such limitations exclude the range that Reasoning Level three addresses.").

An "ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so." *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000). The Fifth Circuit has noted that, in the case of conflicts between the DOT and a

VE's testimony, "the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation." *Id*. at 146. "Neither the DOT nor the [vocational expert] evidence automatically 'trumps' when there is a conflict." SSR 00-4p, 2000 WL 1898704, at *2. If there is a conflict, implicit or express, SSR-04p states that the "adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information." *Id*.

Here, the ALJ asked the VE whether the information provided conflicted with the DOT. The VE stated that it did not. In fact, the VE listed these jobs as a Reasoning Level 3 during the hearing, and Moore's counsel did not cross-examine the VE on whether that Reasoning Level was appropriate in light of the hypothetical the ALJ had just given. The Fifth Circuit has recognized in such circumstances that "claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000).

This last point is also fatal to Moore's argument that she cannot work as an escort vehicle driver—her counsel failed to question the VE on this issue. Instead, the only question Moore's counsel raised with regard to this job was whether it could be performed by someone who was unable to respond appropriately to an emergency situation. The VE confirmed that a person who was unable to respond appropriately to an

emergency situation could not work as an escort vehicle driver. But the ALJ did not find that Moore's RFC included such a limitation. Accordingly, the ALJ did not err by finding that Moore was able to perform the jobs of call out operator, escort vehicle driver, and surveillance system monitor, and that Moore was therefore not disabled.

## CONCLUSION

After considering Moore's motion for summary judgment, the Commissioner's motion for summary judgment, the record in this case, and applicable case law, the Court finds that there is no genuine dispute of material fact and that the Commissioner's motion for summary judgment should be **GRANTED** and that Moore's motion for summary judgment should be **DENIED**. The decision of the Social Security Administration is affirmed; and this appeal is dismissed with prejudice.

A separate judgment will be entered in accordance with Federal Rule of Civil Procedure 58.

SIGNED at Galveston, Texas, this 29th day of September, 2017.

George C. Hanks Jr.
United States District Judge